I have pleased the court. My name is Michael Kim, and I am one of the counsel records for the plaintiffs and appellants in this matter. We are here today to discuss the District Court's order granting the defendant's motion under Rule 12b-6. Now the case we're here today involves a video game. It's a computer video game. The game has two components to it. There is a product, and we have services. Could you tell us what the object of the game is? The object of the game is to buy the game software, install it into your computer, and then play against other players online. How do you win the game? I don't think there is a final object of winning or losing. What it is, is essentially you gain points, or you achieve different objectives online. Are you competing with anybody? You are competing with other players online. You form alliances, you form groups, you form teams with other players online. The essential object of the game is to progress through the different stages of the game, and you gain experience points, you gain different awards online. So essentially it's a virtual world that you're playing in. So that is the object of the game. Now in terms of the product, the product here is the game software. You go to a retail store, you purchase a copy of it, it comes in a box for $14.95. And after you purchase the game software, you install it onto your computer. Can I ask you, we're familiar with the facts, we've looked at your briefing. You had two different claims as I understand, but one of them was this point of sale argument. But when I looked at your complaint about the point of sale issue, about what was known at the time of purchase, I'm looking at paragraph 29 in your complaint. It says, as a result of defendant's failure to disclose the forfeiture clause at the point of sale, plaintiffs and the members of the class purchased the game without knowing about the forfeiture clause. And so while that seems to be a statement of fact, it doesn't say that your clients were injured. And I was looking for some injury. It doesn't say they wouldn't have purchased the game had they known about the forfeiture clause. It doesn't say that they tried to return the item when they found out about the forfeiture clause. So how is there any injury stated for that part of your complaint, that claim? I think there are two parts to that question. In terms of did they try to or make an attempt to return the game, we allege in the complaint that the game cannot be returned once it's opened. So whatever attempt they would have made or they tried to make would have been futile, regardless of what that was or should have been. What was the injury, though? The injury itself is the purchase of the game without knowledge of that specific penalty clause. But how did the lack of knowledge cause any injury? Because you're not saying you would have not bought it had you known about it, had the clients known about it. We do allege in the complaint that that clause, that particular clause, was material. I think we're using that term in the legal sense that once something is material, then that becomes an important information that the buyer should have in making that purchase decision. And how would it affect your clients? Would they not have bought it? I mean, it's just not in the complaint, I guess. It's not clearly stated, but we do allege that that clause was material to their decision-making process at the point of sale. That had they known about it, I guess it's not clearly spelled out, but we do say that material. And what we mean by that is had they known that information, then they would have not purchased that game. And I think we mentioned that this information was material in the complaint at paragraph 36. It appears on page 7, line 8 of the complaint. Now, you refer to this as a forfeiture. Yes. But the title for these, the software remains with the company. Why is it a forfeiture when the company claims its property? Well, I think that I respectfully, well, I understand where this Court is looking at. I think the Court is looking at that clause in the contract that says that Square Enix retains all rights, interests, and titles of the software. Exactly. Now, if we analyze the purchase as a license then, then the fallback analysis is that this has to be a copyright license. Because if it's not a purchase or sale, then it has to be a license. Now, if we say that this is a license, then we have to say that this is a non-exclusive copyright license of indefinite duration. Now, the Ninth Circuit Court has said. It's not indefinite duration, right? It's laid out in their user agreement and policies that it terminates if you don't pay the fee every month. Now, good point. I think that the Court makes an excellent point. And here's the distinction. As I stated before, there is the product part and there is a service part. The product that these users purchase is the game software. Now, what the user agreement is saying is that if you don't pay your fees, then you don't get access to the game servers. That's the service component of this package. So, if it's a license, though, I guess you haven't really purchased anything. You have a license to use the game. You have a license to use the product, the game software, for $14.95. And then there's a subscription service. Exactly. And there's a subscription component to it, which is on a month-to-month basis. That's what they allege, but it's not really a month-to-month subscription. Well, don't they automatically deduct it every month? Yes, they do. Sort of like my cell phone. They just take the money right out of my phone. Good point. And I like to sort of analyze to that. You buy a phone from, let's say, AT&T, and you subscribe for their services. Now, there is a plan called a pay-as-you-go plan, where you buy the phone and you subscribe on a month-to-month basis. Now, you can skip a month, and then you can sign up. You can reactivate your phone again the next month. Here, you don't get to do that. Well, no, you get it for three months. But your clients don't own the property. They forfeit nothing. Their license terminates, that's it. Well, that's what they forfeit, the license. If it's a copyright license of indefinite duration. But it's not of indefinite duration. I don't understand why you're saying it's of indefinite duration. They have the terms of the license. Not for the game software itself. The game software is purchased at a retail store for $14.95, and you're finished. You purchase that software, and you have a license to use that software. Now, then you have to go online. You have to sign up for an account online. That account comes with a month-to-month subscription. So these are two separate things. You have a product, and you have a service. Council, did you have a question? Council, I have a question. Yes. I'm having trouble following this argument. As I understand it, the doors to the virtual world are closed if a person doesn't pay their monthly fee. In other words, the user agreement says if you don't keep paying this every month, you can't play it online. So if I'm wrong on that, you can let me know. But assuming that's correct, then you, in essence, are saying you buy a software, but you can't use it. Correct? If you can't go online, can you use this software to play a game on your own computer? It is. Without a monitor, or can you not? Well, this game is played online, and that is correct. But the game software, you still have it in your computer so that you can use it later on. The way it functions is this. So Judge Gold is correct, that you have the software, but there's nothing really you can do with it. You can have the character spin around on your own computer, but you can't really get the use of the software, which is… Going into this virtual world and going on quests and missions with your characters. Yes, you wouldn't be able to have full scope of the virtual experience by having it in your computer. You would have to go online. And I think that the problem in this case is that you have a service account that you have to pay for. But I guess I don't understand what's wrong with the subscription service. So I still have my phone, but if I don't pay AT&T anymore, I can't use it for anything. So I have to continue to pay them. Now, if they had a contract which said, if you don't pay for three months, we will stop your service, and you have to back pay for three months to get on again, maybe I would go over to Sprint instead. But I don't see why there's anything wrong with that. It does more than that. After three months, you lose your product. You lose game characters, right? That's the only thing you're losing, right? You lose the software copy that you purchased. You lose that. You have to go buy another software copy. Well, you still have whatever the software thing is in your computer, right? It's useless. Well, it may be useless, but you still have it. It's like my phone is useless unless I've got a subscription service. Well, the problem is you can't use their software anymore after three months. So you have to go out to a retail store and purchase a new copy. So, for instance, you sign up for a phone. If I purchase a phone, you sign up for their service after, and you let it last for three months. That phone essentially cannot be used anymore, so you have to go back to the AT&T and repurchase that phone again. Their user agreement that I'm looking at here doesn't say you have to buy new software. It says you just have to pay the back amounts in order to reactivate your account. Correct. So you're saying that's not true. That's not true. That component, that penalty clause that I just mentioned, where you have to go back to AT&T and repurchase a new phone, that is missing. Now, where is the penalty clause? Is it in the record? It's in the game manual. Is it in the record? It's not in the user agreement. Is it in the record that you provided to the district court? Yes. We spelled that out in the complaint, Second Amendment complaint, that that penalty clause is missing from the user agreement, and that's one of the problems in this case, that, first of all, they don't disclose that information on the clause. And where is that in the complaint? I think I'm just – I was trying to find what the forfeiture clause was, and it says – let's see. Is that in paragraph 16? It's – yes, that's the forfeiture clause. Players forfeit their game and game characters, and the word game means – The game software. The game software is what you were saying. Counsel, how long do you contend that a company in this industry should have to keep data on characters in their computers when a customer is no longer paying them a monthly fee? You know, is it like – if it's not three months, which they permit, is it six months, is it a year, is it ten years? You know, how long do they have to keep the data showing who these characters were around? I think that that point was briefly raised during one of the arguments in the district court, and that's a good point. How long do they have to keep the data on their servers? Now, that is not one of the questions raised – that we're trying to raise in this case. And one of the problems is that – well, we know that they do still retain the data beyond the three months. So, in order to retrieve all the data and game characters, you have to – you're forced to go out and purchase a new game software, a new copy of the game. And by doing that, you can retrieve the data. And that is one of the factual questions that we do need to address in this case, in terms of how long do they retain that information in their servers. And that's – and by forcing the users to go out and purchase a new copy. Now, what is a function of that provision? It essentially forces users to keep paying the monthly subscription fee so that they don't lose the game software. You have seven seconds left. Do you want to say that? I would like to reserve the time for rebuttal. Thank you, Your Honor. May it please the Court. Mark Zwillinger on behalf of Square Enix. I'd like to start with the question that Judge Gould asked and try to clear that up. Final Fantasy XI Online is an online game only. It can't be played in a standalone way. It's not like an Xbox game that your child can play at home and then connect to people online. It only is played online in the online world. And so if you don't have a subscription to connect to Square Enix's game servers, the game does nothing. It's not even a situation where the characters can spin around but not adventure. There's art on the disc, but you can't get it to function or do anything. And the way a purchaser would know that in the store that they have to subscribe is – the supplemental excerpts of record – it's right on the box. The game is called Final Fantasy XI Online. There's a sticker that says free subscription for 30 days. It says internet connection required, additional online fees required. So there's no real dispute about that. The plaintiffs in this case not only purchased the game in the store, but then they took the game home, they opened it up, they got the manual for the game in which the play online member agreement is presented, and then they signed up online and signed up for game characters and played the game for months, if not years. They're now alleging that there's a clause, a forfeiture clause, that was not in the manual. It's not, in fact, in the online agreement. It's not in the record. But there's a clause that causes a forfeiture of the game characters and game software if they don't continue to pay the online fees. And what I can say about that is it's neither a clause in a contract between the plaintiffs and Square Enix nor is it a forfeiture because what it does is it works to plaintiffs' benefit, if anything, not their detriment. The play online member agreement is very clear that as soon as they stop paying their fees, they lose access to the game world. So as soon as that moment comes where they're no longer playing online, they have no access to their characters, they have no access to the game data. And that's clear in the contract between the players and Square Enix. And even though there are five plaintiffs and seven subclasses and many reasons why the claims fail, I think the clearest thing is that their agreement to the play online member agreement bars all the claims that they have in this case. And I just want to focus the court on a couple of places in the member agreement where this is clear. Is that in the record, the play online agreement? Yes, it is, Your Honor. It's in the excerpts of record at page 41 and 42. And it is the agreement that was not only... Perhaps the user agreement is the same as the play online agreement? Yes, it is. Yes. It's referred to several different ways. It's referred to as the POMA or the member agreement. But what it basically is is the agreement they all signed. And they were presented, when I say signed, they were presented to all users to create their online game account. They had to agree to it on screen. And I don't know if the court had it handy, but it's in the manual. It was presented on screen. And paragraphs 3.2 deal with termination. And 3.2A says the rights to use the game terminate automatically upon any breach of the agreement. And 3.2B says the players can terminate at any time by canceling their user account. And 3.2C says Square Enix, which is referred to as SEUI here, reserves the right to terminate the service at any time with prior notice. And 4.1, which, Jessica, you were referencing before, says that Square Enix owns the right title and interest to the service, the software, and is the sole owner of any data generated for the use of the game. This contract makes clear that there is no penalty on breach of the contract. There's no early termination fee, like in the cell phone example. Square Enix doesn't come to your house and take away the software. It just stops working. So the best analogy I can think of for this is if you join a country club and you pay an initiation fee and then you have to pay your monthly dues. And while you're a member of the country club, you can play the games the country club has to offer. You can play tennis and golf and racquetball. You can be listed on the ladder as the second best player in the club. But when you stop paying your monthly dues, you lose access to the club. The club takes you down from the tennis ladder. And to the extent the club gave you a key card to get into the club, to wave in front of the doors to let you in, the key card stops working. It's not a forfeiture of the key card. You just can't use it to access the club. And that's what went on here. The software just stops working. And whether you look at it like Square Enix terminated them for nonpayment, which says when they terminate you, you have no access to the game, or they terminated willingly by choosing not to play, the result is the same. They don't get to use the club anymore. Is there something that explains that you would have to buy new software? Because here the cost of the software is not that great. But in other cases, the software is very expensive. What they're referring to with regard to repurchasing the software was actually, as I said, not a clause in the contract. It was a data retention limitation that Square Enix had on its software in 2003 and 2004. Whereas once the software, and this isn't in the record because we never got a CLRA notice by them, so a 30-day notice to explain what was going on. But in 2003 and 2004, once the software was associated with a game account, it couldn't be associated with another game account. So the only way to get back in was to get a new software. Obviously, this isn't the best way for the business to run. That's a practice that went away a long time ago. But taking the facts alleged as true in the complaint, we did say to them in the contract, even in 5.2, that there might be reactivation fees if they wanted to come back and play the game. And that's just the way the game worked then. It's not the way the game works now. The other point I want to mention is the member agreement is clear about there's no illegal penalty. There's no penalties at all for termination. But they allege that the nondisclosure of this clause at the point of sale was material. And I heard Mr. Kim say that they allege in the complaint that it's a material term. They actually didn't. Only for Plaintiff Leong did she allege it was a material term. None of the other plaintiffs alleged it was material to their decision to purchase the game. The district judge pointed that out below. Part of the reason he found that there was no Article III standing, there was no standing to bring the claim, is that this nondisclosure of this term couldn't have been material. And the reason it couldn't have been material is, as I said before, they got home, they signed up to this member agreement. The member agreement makes it clear what happens when you terminate. And the key to materiality is being able to allege that if you had been presented with the information, you would have made a different decision. But here they were presented with the information at the time that they signed up for the member agreement and they didn't make a different decision. But they had already purchased the software and opposing counsel notes that it's not returnable. That's a curious allegation because they didn't allege they tried to return it. They didn't allege that they disagreed with the terms. They didn't allege that they made any effort to contact the company. They made an allegation that the retailer wouldn't take it back. And the district judge picked up on this and asked them in the oral argument below, it's on the pages 60 and 61 of the excerpts of record, you didn't allege that they made any effort to return the game. And counsel conceded we didn't because presumably they didn't make that effort. So I don't think that allegation is enough. First of all, it doesn't allege that my client wouldn't have taken the game back. And it doesn't allege that they made any effort. And it doesn't allege that they disagreed with the terms. They played this game for months, if not years. Some of them played it for years. So there's nothing in the record to suggest that when they were presented with a member agreement, they disagreed and took any action whatsoever. The only thing I want to add is that the briefs focus on the district court going beyond what the district court should look at at a 12b6 motion. And I think that's wrong. The district court had an obligation to look at Article III standing and standing under Proposition 64. And so they actually had the burden on that point. And the district court doesn't need to credit the conclusionary allegations they made on standing when the district court has a contract in front of it that contradicts those terms. Are there no further questions? I have no questions. Thank you. Thank you. We have a few seconds remaining. We'll do a minute for rebuttal. Your Honor has made an excellent point. And I'd like to go back to his analogy of this country club membership. Let's assume that the key card costs $50,000 to obtain, and you allow your membership to last for three months, and you lose the key card and you have to purchase the key card again. How does the analysis change? I think you would have a slightly different sort of take on that scenario. The software is only $1,459. Assume that the software costs $10,000, and you allow your subscription to last for three months. And how does that analysis change? I think we would have a slightly different take on that. And I think we should look at the user agreement, because the user agreement does not say that you're going to lose your software copy if you allow your subscription to last for three months. That's the key point in this case. It's not in the user agreement. And that's what we alleged from the beginning in the original complaint, in the First Amendment complaint, and the Second Amendment complaint. And so I would urge this Court to really look at the user agreement and see where in the agreement does it say that the user will lose the software copy and have to go out there to another retail store and purchase another copy if you allow your subscription to last for three months. That's all I have, Your Honor. Thank you. The case of Leong v. Square Enix of America is submitted. And we'll take a 10-minute break before we have the Tom Kelly Studios v. State Farm.
judges: Noonan, Gould, Ikuta